**GIBSON GUITAR CORP., Plaintiff,**

v.

**PAUL REED SMITH GUITARS, LP, Defendant.**

No. 3:00–1079.

United States District Court, M.D. Tennessee, Nashville Division.

July 2, 2004.

Edward D. Lanquist, Jr., Waddey & Patterson, Nashville, TN, Jonathan D.

Schiller, Kevin R. Anthony, David R. Boyd, Seth Goldberg, Boies, Schiller & Flexner, LLP, Washington, DC, John F. Triggs, Greenberg Traurig, LLP, New York City, David Kessler, Greenberg Traurig, LLP, McLean, VA, for plaintiff.

Alan Dale Johnson, Alfred H. Knight, Willis & Knight, Nashville, TN, Phillip Lester North, A. Gregory Ramos, North, Pursell, Ramos & Jameson, William D. Coston, Kevin B. Collins, Washington, DC, for defendant.

## MEMORANDUM

HAYNES, District Judge.

Plaintiff, Gibson Guitar Corporation, filed this action for damages and injunctive relief under the Trademark Act of 1946, the Lanham Act, as amended, 15 U.S.C. §§ 1051 *et seq.* against Defendant Paul Reed Smith, LP ("PRS"). Gibson asserts claims for trademark infringement, counterfeiting, unfair competition and trademark dilution. Gibson's claims involve its "Les Paul" single cutaway guitar with a body design for which Plaintiff has an incontestable registered trademark. PRS manufactures and sells a PRS "Singlecut" guitar with a design that allegedly infringes on Plaintiff's registered trademark and trade dress. In response to Gibson's complaint, PRS filed a counterclaim (Docket Entry No. 41) seeking a declaration that PRS has not infringed upon any valid trademark or trade dress of Gibson and that Gibson's trademark and trade dress in its Les Paul 'model guitar are invalid and/or unenforceable.

In earlier proceedings, Gibson moved for partial summary judgment (Docket Entry No. 61) and PRS moved for summary judgment (Docket Entry No. 64). Gibson sought summary judgment only on its claim that the PRS's "Singlecut" guitar infringes on Gibson's trademark registra-

tion No. 1,782,606 (hereinafter "606") for its Les Paul single cutaway guitar. Gibson contends, in sum, that the PRS "Singlecut" infringes on the Plaintiff's registered trademark for its Les Paul guitar, and PRS's "Singlecut" will likely cause confusion in the marketplace as to its source of origin, to Gibson's detriment. PRS sought summary judgment on all of Gibson's claims and PRS's counterclaims.

Gibson's federal trademark infringement claim is for violations of the Lanham Act that provides, in pertinent part, as follows:

(1) Any person who shall, without the consent of the registrant—

(a) use in commerce any reproduction, counterfeit, copy, or *colorable imitation* of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is *likely to cause confusion, or to cause mistake,* or to deceive;

\*      \*      \*      \*      \*      \*

shall be liable in a civil action by the registrant for the remedies hereinafter provided.

15 U.S.C. § 1114(1)(a) (emphasis added).

Based upon a consideration of the eight factor in *Landham v. Lewis Galoob Toys, Inc.,* 227 F.3d 619, 626–27 (6th Cir.2000), the Court concluded that most of these factors favored Gibson's claim for PRS's violation of its incontestable registered trademark for Gibson's Les Paul Guitar. Given this conclusion, the applicable law and undisputed facts, the Court also granted Gibson's motion for partial summary judgment. (Docket Entry No. 144 Memorandum). The Court also concluded PRS's defenses and counterclaims related thereto lacked merit, and denied PRS's motion for summary judgment. With those rulings, the Court did not consider it necessary to address Gibson's other claims of counterfeiting, trademark dilution and unfair competition. *Id.* at p. 56. The Court gave the

parties ninety (90) days to complete any discovery on disgorgement of PRS's profits on the sales of its offending Singlecut guitar. *Id.* at p. 56, citing *WSM, Inc. v. Tennessee Sales Co.,* 709 F.2d 1084, 1086 (6th Cir.1983).

In a subsequent stipulation, Gibson dismissed with prejudice all of its claims except it infringement claim based upon its 606 incontestable registration mark (Docket Entry No. 139). PRS dismissed all of its counterclaims except those counterclaims pertaining to Gibson's 606 incontestable registered trademark. *Id.* at p. 2. The parties agreed that the remaining issues are "damages," willfulness and attorney fees on Gibson's 606 trademark. *Id.*

Before the Court is Gibson's motion in limine to exclude portions of the report of PRS's expert, Gary Wingo. (Docket Entry No. 146). Gibson contends, in sum, that the purchaser and dealer surveys in Wingo's report and his related narrative address the issue of likelihood of confusion that was previously determined by the Court and is irrelevant to the issue of remedies.

PRS responds, in essence, that Wingo's report includes surveys that are relevant to its apportionment defense to Gibson's damages claim. As stated by PRS, "the major issue to be decided at this stage of the case is given that no reasonable person would be confused at the time of purchase of the PRS Singlecut, what effect, if any did the initial interest confusion involving Gibson's two dimensional body shape have with respect to the sale of PRS guitars, and any profits earned by PRS." (Docket Entry No. 152, Defendant PRS's opposition to Gibson's motion in limine at p. 2).

In addition, at the final pretrial conference and in its pretrial brief, (Docket Entry No. 155), PRS asserts its right to a jury trial on Gibson's damages claim and cites expert testimony and other proposed

proof on other similarly shaped guitars in the market. In PRS's view, this proof is necessary to determine the apportionment of damages and the appropriateness of injunctive relief as well as a stay of injunctive relief.

This Memorandum address Gibson's motion *in limine* and the above stated issues raised in PRS's pretrial brief.

### A. Gibson' Motion in Limine

### 1. Review of the Wingo Report

Gary Wingo, PRS's expert, has a Bachelor of Science degree in Mechanical Engineering from West Point and a Masters in Science from the Sloan School of Management, Massachusetts Institute of Technology (Docket Entry No. 155, Attachment B, Exhibit thereto). Wingo is a Certified Professional Engineer in the state of Virginia. *Id.*

Wingo had presented papers at various conferences. *Id.* at pp. 1–2. Wingo's unpublished masters thesis was "Venture Capital Decision Making in Technology Based Enterprises." *Id.* at p. 2. Wingo's publications are on the subjects of Business Failure and the Law," an article; "the C–Stone Utilities ® Software for the Convenience Store Industry"; "Making Better Investment Decisions ®"; "Maximizing Investor Returns in the Convenience Store Industry ®"; and "Impact on Defense Industrial Capability of Changes in Procurement and Tax Policy ®." *Id.* at p. 2.

Wingo, is currently vice-president with Analysis Research Planning Corporation ("ARPC"). *Id.* As an expert, Wingo has previously provided or prepared analyses, including statistical analysis of claims involving hiring of illegal aliens, product failure, tort, wrongful death and insurance claims, violations of tax-deferred claims as well as class action refund claims, and quantification of lost profits in business interruption disputes. Wingo spent five

(5) years in market research and market studies. Wingo's latter experiences also include business strategy, planning and market research with a computer distributor.

The challenged portions of Wingo's report involve his "two market research surveys to ascertain: (1) whether any confusion existed in the market place at any time in the bargaining process between the PRS Singlecut and the Gibson Les Paul; and (2) if confusion existed, whether it could be traced to the actual purchase of the Singlecut ® guitar." (Docket Entry No. 155, Attachment B at p. 2). For his survey, Wingo contacted "162 owners of PRS Single cut guitars" and "PRS's top ten dealers." *Id.* Those surveys are reflected in Attachments eight (8) through 12 to his report.

There are other exhibits in this binder on the PRS registered marks, an affidavit filed with the Trademark Office, Gibson's opposition to PRS's trademark application, correspondence and a settlement agreement between Gibson and PRS. *Id.* at Exhibits H through L.

### B. Conclusions of Law

The pertinent Federal Rules of Evidence on the admission of expert testimony provide as follows:

Rule 702. Testimony by Experts

If scientific, technical, or other special knowledge will assist the trier of fact to understand the evidence or to determine the fact at issue, the witness qualified as an expert by knowledge, skill, experienced training or education, may testify thereto in the form of an opinion or otherwise.

Rule 703. Bases of Opinion Testimony by Experts

The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived

by or made known to the expert at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence in order for the opinion or inference to be admitted.

Rule 403. Exclusion of Relevant Evidence on Grounds of Prejudice, Confusion or Waste of Time.

Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion, waste of time, or needless presentation of cumulative evidence.

Fed.R.Evid. 403, 702, 703.

■■■■ "To qualify as an expert under Rule 702, a witness must first establish his expertise by reference to 'knowledge, skill, experience, training, or education.'" *Pride v. BIC Corp.*, 218 F.3d 566, 577 (6th Cir.2000). While a person may be qualified as an expert, his testimony may still be inadmissible if the methodology "employed by the expert in analyzing the data obtained in the visual inspection, and the scientific basis, if any, for such an analysis" is unreliable. *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 153, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999). A district court is not required to conduct an evidentiary hearing to qualify an expert witness under *Daubert*. *Clay v. Ford Motor Co.*, 215 F.3d 663, 667 (6th Cir.2000), *cert. denied*, 531 U.S. 1044, 121 S.Ct. 644, 148 L.Ed.2d 549 (2000).

As to the admissibility of Wingo's opinions, under Federal Rule of Evidence 104(a), the Court must make a threshold determination whether the expert's opinion should be admitted. The Sixth Circuit has stated that "close judicial analysis of such technical and specialized matter is necessary not only because the likelihood of juror misunderstanding, but also because

expert witnesses are not necessarily always unbiased scientists. They are paid by one side for their testimony." *Turpin v. Merrell Dow Pharmaceuticals, Inc.*, 959 F.2d 1349, 1352–53 (6th Cir.1992). "If an opinion is fundamentally unsupported, then it offers no expert assistance to the jury. Furthermore, its lack of reliable support may render it more prejudicial than probative, making it inadmissible...." *Viterbo v. Dow Chemical Co.*, 826 F.2d 420, 422 (5th Cir.1987) (citations omitted); *Robinson v. Union Carbide Corp.*, 805 F.Supp. 514, 523 (E.D.Tenn.1991).

■■ The Supreme Court in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), imposed a gate-keeping function on the district courts to ensure that expert testimony was based on scientific knowledge. *Id.* at 597, 113 S.Ct. 2786. *Daubert* requires that "[i]n order to qualify as 'scientific knowledge,' an inference or assertion must be derived by the scientific method, i.e., 'a grounding in the methods and procedures of science [that] connote more than subjective belief or unsupported speculation' and that 'apply to any body of known facts or to any body of ideas inferred from such facts or accepted as truths on good grounds.'" *Id.* at 590, 113 S.Ct. 2786 (quoting Webster's Third New International Dictionary 1252 (1986)). In short, the requirement that an expert's testimony pertain to "scientific knowledge" ensures a standard of evidentiary reliability. *Id.* In a footnote, the Court emphasized that "our reference here is to evidentiary reliability—that is, trustworthiness." *Id.* n. 9. Later, the Court noted that "[t]he focus, of course, must be solely upon principles and methodology, not only the conclusions they generate." *Daubert*, 509 U.S. at 595, 113 S.Ct. 2786.

In *Daubert*, the Court listed the following factors for consideration of whether

the opinion testimony involves scientific knowledge:

• Whether [the theory or technique] can be (and has been) tested.

• Whether the theory or technique has been subjected to peer review and publication.

• In the case of a particular scientific technique, the court ordinarily should consider the known or potential rate of error.

• Widespread acceptance can be an important factor in ruling particular evidence admissible, and a known technique which has been able to attract only minimal support within the community...may properly be viewed with skepticism.

*Id.* at 593–94, 113 S.Ct. 2786.

In *Kumho Tire,* the Supreme Court later expanded the district court's gatekeeping obligation under Fed.R.Evid. 702, and applied *Daubert* factors to all expert testimony, including persons with specialized knowledge. 526 U.S. at 150, 119 S.Ct. 1167.

Another consideration is the "fit" or "whether expert testimony proffered in the case is sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute." *Daubert,* 509 U.S. at 591, 113 S.Ct. 2786 (quoting *United States v. Downing,* 753 F.2d 1224, 1242 (3rd Cir. 1985)); *see also United States v. Bonds,* 12 F.3d 540, 558 (6th Cir.1993).

The Sixth Circuit has provided additional guidance as to the application of Rule 702. For example, it is established that the plaintiffs bear the burden of showing the sound engineering basis for Stilson's conclusions:

The party seeking to have the testimony admitted bears the burden of showing "that the expert's findings are based on sound science, and this will require some *objective, independent validation of the expert's methodology."*

*Smelser v. Norfolk Southern Ry. Co.,* 105 F.3d 299, 303 (6th Cir.1997) (emphasis added and citation omitted).

As this Court noted, there are additional questions and factors that can be asked on evaluating expert testimony:

(5) Are the underlying data untrustworthy for hearsay or other reasons? (6) Does the underlying data exclude other causes to a reasonable confidence level? (7) What do the leading professional societies say about this specialty or this type of testimony? (8) How much of the technique is based on the subjective analysis or interpretation of the alleged "expert"? (9) The judge's experience and common sense.

*Hein v. Merck & Co.,* 868 F.Supp. 230, 231 (M.D.Tenn.1994). The Ninth Circuit in the remand of *Daubert* added yet another factor—whether the expert's opinion is a product of independent research or whether the opinion was formulated for the litigation. *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 43 F.3d 1311, 1317 (9th Cir.), *cert. denied,* 516 U.S. 869, 116 S.Ct. 189, 133 L.Ed.2d 126 (1995).

It must be noted that "nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence which is connected to existing data only by the *ipse dixit* of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." *General Electric Co. v. Joiner,* 522 U.S. 136, 146, 118 S.Ct. 512, 139 L.Ed.2d 508 (1997).

### 1. Apportionment Defense

The legal bases for Wing's survey evidence and expert opinion thereon as well as PRS's theory of defense to an award of "damages", is the apportionment defense. PRS cites several Supreme Court decisions, *Mishawaka Rubber & Woolen Mfg., Co. v. S.S. Kresge Co.,* 316 U.S. 203, 206, 62 S.Ct. 1022, 86 L.Ed. 1381 (1942); *Sheldon*

v. *Metro–Goldwyn Pictures Corp.*, 309 U.S. 390, 400–01, 404, 60 S.Ct. 681, 84 L.Ed. 825 (1940) and *Dowagiac Mfg. Co. v. Minnesota Moline Plow Co.*, 235 U.S. 641, 35 S.Ct. 221, 59 L.Ed. 398 (1915), as well as the Sixth Circuit decision, *Wynn Oil Co. v. American Way Service Corporation*, 943 F.2d 595, 606 (6th Cir.1991) (Docket Entry No. 152 PRS's opposition at pp. 6–7). PRS cites other decisions from other courts. *Id.* at pp. 8–10, but the Court is bound by the Supreme Court and the Sixth Circuit precedents and the threshold analysis begins with those decisions.

In *Sheldon*, the Supreme Court followed and quoted *Dowagiac*, a patent infringement case to hold that, "In so far as the profits from the infringing sales were attributable to the patented improvements they belong to the plaintiff, and in so far as they were due to other parts and features they belonged to the Defendants.... We see no reason why these principles should not be applied to copyright cases." 309 U.S. at 403, 405, 60 S.Ct. 681 (quoting *Dowagiac*, 235 U.S. at 646, 35 S.Ct. 221). In *Mishawaka*, the Supreme Court summarized its precedents:

> *The plaintiff of course is not entitled to profits demonstrably not attributable to the unlawful use of his mark.* The burden is the infringer's to prove that his infringement had no cash value in sales made by him. If he does not do so, the profits made on sales of goods bearing the infringing mark properly belong to the owner of the mark. *There may well be a windfall to the trademark owner where it is impossible to isolate the profits which are attributed to the use of the infringing mark. But to hold otherwise would give the windfall to the wrongdoer. In the absence of his proving the contrary, it promotes honesty and comports with experience to assume that the wrongdoer who makes profits from the sales of goods bearing a mark belonging to another*

*was enabled to do so because he was drawing upon the good will generated by that mark.* And one who makes profits derived from the unlawful appropriation of a mark belonging to another cannot relieve himself of his obligation to restore the profits to their rightful owner merely by showing that the latter did not choose to use the mark in the particular manner employed by the wrongdoer.

316 U.S. at 207, 62 S.Ct. 1022. (emphasis added).

In *Sheldon*, the Court also acknowledged its earlier precedent that "when copyrighted portions are so intermingled with the rest of the piratical work 'that they cannot well be distinguished from it, *the entire profits realized by the defendants will be given to the plaintiff.*'" 309 U.S. at 401–02, 60 S.Ct. 681 (quoting *Belford Clarke & Co. v. Scribner*, 144 U.S. 488, 12 S.Ct. 734, 36 L.Ed. 514 (1892)) (emphasis added). As one district court aptly noted, "if the alleged infringing elements of [Defendant's] mark are so intertwined with the non-infringing elements, apportionment may be inappropriate." *Trouble v. The Wet Seal, Inc.*, 179 F.Supp.2d 291, 305 (S.D.N.Y.2001). (Citing *Business Trends Analysts Inc. v. Freedonia Group*, 887 F.2d 399, 407 (2nd Cir. 1989), citing *Sheldon*, 309 U.S. at 401–02, 60 S.Ct. 681).

■ A fair distillation of these decisions is that if the facts provide a basis to divide the protected mark or material from the non infringing material, then apportionment is appropriate.

■ Here, the facts do not lend themselves to a division of Gibson's protected mark and PRS's Singlecut guitar. As the Court earlier found, PRS made its Singlecut to be a Gibson Les Paul imitation, as reflected in its internal documents. (Docket Entry No. 144, Memorandum at

pp. 19–23, 55–56). Elements of the Les Paul are so intermingled with PRS's Singlecut that the *entire* Singlecut guitar is the offending product. This offending product does not lend itself to a division of protected and unprotected parts. As the Court stated:

> The Court concludes that the shape of the Les Paul guitar as well as the placement of these knobs and switches "constitute more than the sum" of their individual roles and collectively create a unique guitar that the guitar market has long recognized as unique. Thus, the Court concludes that PRS's functionality contention lacks merit.

> \*      \*      \*      \*      \*      \*

From the Court's review of the appearances of the two products and the testimony about them, the only reasonable conclusion is that the Singlecut is striking similarly to Gibson's Les Paul: in its display and shape of the horn and configuration of the knob features. PRS also uses an effect of the sunburst color this is similar in appearance to the sunburst on the Les Paul guitar. The length difference in these guitars is 1/4". Any differences in the surface shape are insignificant, particularly as to advertising. The differences cited by PRS would not impact this conclusion. This conclusion is corroborated by other proof in the PRS meeting notes that PRS made its Singlecut to be a "colorable imitation" for Gibson's Les Paul to secure Gibson's former distributor.

(Docket Entry No. 144 Memorandum at pp. 48, 52).

The facts in the Supreme Court decisions cited by PRS underscore this point. In *Dowagiac,* the Supreme Court addresses a patent infringement claim based on "shoe drills that were incorporated with other essential parts which were not patented." 235 U.S. at 643, 35 S.Ct. 221. As the Supreme Court explained,

In keeping with this statement the claims in the patent were limited to a suitable construction and arrangement of *spring pressure rods in combination with certain correlated elements of the seeding part of a grain drill,*the part which opens the furrows, guides the seed into them, and then closes them. Of that; for other parts were required to complete the machine and make it operative.

\*      \*      \*      \*      \*      \*

In so far as the profits from the infringing sales were attributable to the patented improvements they belonged to the plaintiff, and in so far as they were due to other parts or features they belonged to the defendants. *But as the drills were sold in completed and operative form, the profits resulting from the several parts were necessarily commingled. It was essential, therefore, that they be separated or apportioned between what was covered by the patent and what was not covered by it.*

*Id.* at 645, 646, 35 S.Ct. 221 (emphasis added).

*Sheldon* involved a copyright infringement based upon the defendant's motion picture's plagiarism of the Plaintiff's copyright. 309 U.S. at 397, 60 S.Ct. 681. The Supreme Court noted that, aside from the copyright, the movie stars and movie production producers were, "apart from use of any infringing material". "[B]oth courts below held that but a small part of the profits were due to the infringement . . . ." *Id.* at 406, 60 S.Ct. 681. In *Mishawaka,* the registered trademark was for "a red circular plug embedded in the center of a heel" for a shoe. 316 U.S. at 203, 62 S.Ct. 1022. In a word, PRS's reliance on the apportionment doctrine on damages is inappropriate for the facts of this case.

■ Aside from PRS's apportionment defense, confusion in the marketplace is

irrelevant to the issue of profits. In *Wynn Oil*, cited by PRS on the issue of profits, the Sixth Circuit expressly rejected proof of actual confusion as a predicate for an award of lost profits:

> Defendants argue that actual confusion, proof of which is lacking in this case, must be shown to justify a monetary award. Neither of the cases cited by defendants (*Brunswick Corp. v. Spinit Reel Co.*, 832 F.2d 513, 525 (10th Cir. 1987); *Schutt Mfg. Co. v. Riddell, Inc.*, 673 F.2d 202, 206 (7th Cir.1982)) *support this proposition*. Defendants' cases did not discuss the "profits" language in the statute. Moreover, *to the extent they can be read to require the plaintiff to prove actual confusion before he can recover profits from an infringer, they are contrary to the Supreme Court's reasoning in Mishawaka and must be disregarded.* See 316 U.S. at 204, 62 S.Ct. at 1023 *(holding that plaintiff was entitled to recover profits even though "there was no evidence that particular purchasers were actually deceived into believing that the [goods] sold by [infringer] were manufactured by the [mark's owner]")*.

943 F.2d at 606 (emphasis added).

A requirement of *Daubert* is that the expert opinion must "fit" to the issue before the fact finder 509 U.S. at 591, 113 S.Ct. 2786, clearly. Under *Wynn*, proof of actual confusion, that is the core of Wingo's challenged surveys report, does not "fit" the issue before the Court and is irrelevant to an award of damages or lost profits.

In this regard, PRS persists on its characterization that the Court's entire ruling turns on the "initial confusion doctrine." (Docket Entry No. 152, PRS Opposition to Motion *in Limine* at pp. 2, 3, 4, 5, 6 and Docket Entry No. 155 PRS's Pretrial Brief at pp. 1, 3, 8–10). The initial confusion doctrine is addressed during an analysis of one of the eight factors under the Sixth Circuit's test. Under Sixth Circuit the Court's, likelihood of confusion precedent no one factor of the eight factors is decisive. *Landham*, 227 F.3d at 626–27. In this record, most of the eight factors favored Gibson. In any event, a finding of potential confusion is sufficient for liability, an award damages and an injunction under Section 1117(a). *Daddy's Junky Music Stores, Inc. v. Big Daddy's Family Music Center*, 109 F.3d 275, 284 (6th Cir.1997).

In sum, the Court concludes that under the "fit" element of *Daubert*, the facts of this case render any apportionment of profits and proof of confusion to be factually and legally inappropriate. Thus, Wingo's narrative report addressing confusion as well as his market surveys shall be excluded.

■ Moreover, the binder with Wingo's report contains other evidentiary matters that appear to be on the confusion issue or to lack any probative value or fit to the issue of profits. Thus, the Court concludes that Attachments B, Exhibits 8 through 12 as well as 20, D, E, G, H, I, J, K and L in the Attachments to (Docket Entry No. 155) are excluded. This ruling would also encompass the proposed testimony of Thomas Wheeler, PRS's other expert.[1]

1. The Court is concerned that PRS is adding to the record and using its experts to submit additional merits evidence in the record that were not presented at the time of the Court's ruling on the parties' motion for summary judgment. To challenge an award of summary judgment, the appropriate procedure is a motion under Fed. R.Civ.P. 59(e) or a mo-

tion to reconsider that is treated as a Rule 59 motion *Huff v. Metropolitan Life Ins. Co.*, 675 F.2d 119, 122 (6th Cir.1982). PRS did not do so. Thus, the Court declines to consider any merits evidence that should have been presented when the parties' motions for summary judgment were pending. *Basinger v.*

## 2. Jury Trial

■ PRS asserts its right to a jury trial on Gibson's damages and profits claims under Section 1117(a). In its ruling on the motion for summary judgment, the Court ordered discovery and a hearing on the disgorgement of PRS's unlawful profits from the Singlecut. (Docket Entry No. 144, at p. 56).

"Section 1117(a) grants a district court a great deal of discretion in *fashioning* an appropriate remedy in cases of trademark infringement." *U.S. Structures, Inc. v. J.P. Structures, Inc.*, 130 F.3d 1185, 1191 (6th Cir.1997) (citations omitted). Section 1117(a) expressly provides for judicial determinations of damages or profits.

### Profits; damages and costs; attorney fees

When a violation of any right of the registrant of a mark registered in the Patent and Trademark Office, or a violation under Section 1125(a) of this title, shall have been established in any civil action arising under this chapter, the plaintiff shall be entitled, subject to the provisions of sections 1111 and 1114 of this title, and subject to the principles of equity, to recover (1) defendant's profits, (2) any damages sustained by the plaintiff, and (3) the costs of the action. *The court shall assess such profits and damages or cause the same to be assessed under its direction.*

In assessing profits the plaintiff shall be required to prove defendant's sales only; defendant must prove all elements of costs or deduction claimed .... *If the court shall find that the amount of the recovery based on profits is either inadequate or excessive the court may in its discretion enter judgment for such sum as the circumstances of the case.* Such sum in either of the above circumstances

*shall constitute compensation and not a penalty. The court in exceptional cases may award reasonable attorney fees to the prevailing party.*

(Emphasis added).

In *Wynn Oil v. American Way Service Corp.*, 943 F.2d 595 (6th Cir.1991), the Sixth Circuit quoted approvingly a Seventh Circuit decision:

*The Lanham Act specifically provides for the awarding of profits in the discretion of the judge subject only to principles of equity .... "The trial court's primary function is to make violations of the Lanham Act unprofitable to the infringing party." Other than general equitable considerations, there is no express requirement that the parties be in direct competition or that the infringer willfully infringe the trade dress to justify an award of profits. Profits are awarded under different rationales including unjust enrichment, deterrence, and compensation.*

*Id.* at 606–07 (quoting *Roulo v. Russ Berrie & Co.*, 886 F.2d 931, 941 (7th Cir.1989), cert. denied, 493 U.S. 1075, 110 S.Ct. 1124, 107 L.Ed.2d 1030 (1990) (citations omitted)).

In its Memorandum, the Court noted that disgorgement of profits may be an appropriate remedy, (Docket Entry No. 144, Memorandum at 56–57), and deems disgorgement of PRS's unlawful profits to be the remedy. The parties proof so reflects. As reflected in *Wynn*, these are equitable remedies. The Seventh Amendment right to a jury does not extend to equitable relief. *Esercizio v. Roberts*, 944 F.2d 1235, 1248 (6th Cir.1991). Accord, *Sheldon*, 309 U.S. at 402, 60 S.Ct. 681 ("our decisions leave the matter to the

*CSX Transportation, Inc.*, 91 F.3d 143, 1996 WL 400182 *2 (6th Cir. July 16, 1996) and

authorities cited therein.

appropriate exercise of equity jurisdictions upon an accounting to determine the profits 'which the infringer shall have made from such infringement' "). Given this history of making the infringer account for unlawful profits as an equitable remedy, the Seventh Amendment right to a jury trial does not attach. See *Monterey v. Del Monte Dunes at Monterey*, 526 U.S. 687, 704, 119 S.Ct. 1624, 143 L.Ed.2d 882 (1999)

In Section 1117(a), Congress also left the decision to treble damages to the Court. "In assessing damages *the Court may enter judgment,* according to the circumstances of the case, for any sum above the amount found as actual damages, *not exceeding three times such amount.*" (emphasis added). In *U.S. Structures,* the Sixth Circuit affirmed a district court's order awarding four times actual damages. 130 F.3d at 1191–92. Despite its lengthy history, PRS does not cite any decision that relief under § 1117(a) of the Lanham Act requires a jury trial. This Court does not find any such right and PRS's request for a jury trial should be denied.

### 3. Copying

■ In its pretrial brief, PRS argues a "copying is good" defense and cites in support, *Dastar Corp. v. Twentieth Century Fox Film Corp.*, 539 U.S. 23, 123 S.Ct. 2041, 156 L.Ed.2d 18 (2003); *TrafFix Devices Inc. v. Marketing Displays*, 532 U.S. 23, 121 S.Ct. 1255, 149 L.Ed.2d 164 (2001); *Gray v. Meijer*, 295 F.3d 641 (6th Cir. 2002); and *Abercrombie and Fitch Stores Inc. v. American Outfitters Inc.*, 280 F.3d 619 (6th Cir.2002).

These decisions discuss copying in the context of trade dress and the functionality defense. In *Dastar,* the Supreme Court noted, "In general, unless an intellectual property right such as a patent or copyright protects item, it will be subject to copying." 539 U.S. at 33, 123 S.Ct. 2041 (quoting *TrafFix Devices,* 532 U.S. at 29, 121 S.Ct. 1255). Traffic Devices likewise

involved a trade dress claim based on an expired patent. 532 U.S. at 25, 26, 121 S.Ct. 1255. *Gray* also is a trade dress claim, 295 F.3d at 644, as is *Abercrombie,* 280 F.3d at 624. The Sixth Circuit noted:

> [T]he importance of clearly distinguishing the elements necessary to prove a breach of the Lanham Act from the elements necessary to justify a certain remedy for that breach: "the inquiries should be kept separate because a violation of the Lanham Act can be remedied in more ways than one."

204 F.3d 683, 689 (6th Cir.2000) (quoting *Web Printing Controls Co., Inc. v. Oxy–Dry Corp.*, 906 F.2d 1202 (7th Cir.1990)).

In contrast, Gibson's infringement claim involves an incontestable registered trademark. As discussed in the Court's earlier analysis, such status confers certain legal protections and such a trademark is deemed a strong mark worthy of full protection. (Docket Entry No. 144, Memorandum at pp. 40–42, 43–44). As stated therein, with an incontestable registration proof about other guitars in the market place is irrelevant and at this point so is PRS's evidence of its Singlecut guitar's distinctive characteristics. *Id.* at pp. 43–44. Finally, Gibson's trade mark is not, as PRS argues, the two dimensional guitar, but rather is the entire Les Paul guitar and its appearance. (Docket Entry No. 144, Memorandum at 45–46).

In sum, any proof of copying is irrelevant to the issue of disgorgement of PRS's unlawful profits.

### 4. Fixed Costs

■ Upon Gibson's proof PRS's gross sales, PRS bears the burden of showing for any deductions from gross sales. *Wynn Oil,* 943 F.2d at 605 ("It is not the plaintiff's burden to prove profits with exactness because the statute places the burden on the defendant once the plaintiff comes forward with proof of the defen-

dant's gross sales."). This burden is by a preponderance of the evidence "that the particular overhead classifications are such that an apportionment [of costs] is proper." *Henry Hanger & Display Fixture Corp. v.Sel–O–Rak,* 270 F.2d 635, 643 (5th Cir.1959).

PRS raises the issue of the deductibility of its fixed costs associated with its Singlecut guitar. As noted earlier, the Supreme Court has applied profit determination principles in patent infringement decisions to copyright cases. *Sheldon,* 309 U.S. at 405, 60 S.Ct. 681 (stating "We see no reason why these principles should not be applied to copyright cases."). In *Schnadig Corp. v. Gaines Mfg. Co.,* 620 F.2d 1166 (6th Cir.1980), a patent infringement action, the Sixth Circuit addressed the appropriate treatment of fixed costs in the determination of the lost profits issue. The Court quoted approving a Fifth Circuit decision:

> Similarly, in the lone case which has considered the fixed expense question in the context of a design patent infringement action, *Henry Hanger & Display Fixture Corp. v. Sel–O–Rak Corp.,* 270 F.2d 635 (5th Cir.1959), the court found the factual relationship between the infringing production and the claimed expense to be determinative. The court wrote:
>
> > *While apportionment of some overhead and general business costs between the infringing and the noninfringing operations of a business enterprise will usually be made, this should not be done unless it is shown that the particular overhead classifications are such that an apportionment is proper. It is not enough merely to say that the overall overhead for income tax purposes was a stated percentage of overall sales.* The master's determination that the claim of the defen-

dants to an allowance for overhead was not established was correct. 270 F.2d at 643.

Although a clear-cut rule may be more comforting to litigants, the approach illustrated above is a realistic one. *Even where the amount of fixed expenses is stipulated, as here, the relationship of those expenses to the infringing activity may vary considerably. The alternative available uses of the facilities devoted to the infringement must be considered, and these too will vary. The ascertainment of fixed as opposed to variable expenses is itself a largely subjective process, albeit one that is aided by accounting guidelines. All of these factors must be weighed by the district court in each case so that the expenses properly chargeable against the recoverable profits can be ascertained. The guiding principle must always be, as the Levin court noted, "that the patentee recover every dollar of advantage realized by the infringer from the infringement."*

*Id.* at 1174–75.

The Court applies *Schnadig* here so as to allow a deduction for fixed costs in the production of PRS's Singlecut guitar, provided that a proximate and direct correlation is shown. The Court is inclined to follow *Champion Spark Plug Co. v. Sanders,* 108 F.Supp. 674, 680, 681 (E.D.N.Y. 1952) to disallow partners' salaries, withdrawal legal and accounting fees to be deducted as costs.

If there is uncertainty in the showing by PRS on its relevant costs, then the Court will resolve the doubt in the Plaintiff's favor.

> If [infringer] does not do so, the profits made on sales of goods bearing the infringing mark properly belong to the owner of the mark. *There may well be a windfall to the trade-mark owner*

*where it is impossible to isolate the profits which are attributed to the use of the infringing mark. But to hold otherwise would give the windfall to the wrongdoer.*

*Mishawaka,* 316 U.S. at 207, 62 S.Ct. 1022.

### 5. Injunctive Relief

■■■ "A permanent injunction is appropriate relief on summary judgment." *Countrywide Funding Corp. v. Countrywide Financial Corp.,* 879 F.Supp. 771, 774 (W.D.Mich.1994) (citation omitted). *Wynn* also addressed the standard for injunctive relief:

In general, a party seeking an injunction must show that absent the injunctive relief, he would suffer irreparable harm. *See Beacon Theatres, Inc. v. Westover,* 359 U.S. 500, 506–07[, 79 S.Ct. 948, 3 L.Ed.2d 988] (1959). However, *a number of lower courts have held that in the context of an infringement action, "[a] finding of irreparable injury ordinarily follows when a likelihood of confusion or possible risk to reputation appears." Koppers Co., Inc. v. Krupp–Koppers GmbH,* 517 F.Supp. 836, 849 (W.D.Pa.1981) ("A finding of tendency to deceive satisfies the requisite of irreparable harm."); *Design & Mfg. v. Sharp Corp.,* 656 F.Supp. 178, 180 (S.D.Ohio 1987). *The irreparable injury flows "both from the potential difficulty of proof of plaintiff's damages, and also from the impairment of intangible values ...." Koppers,* 517 F.Supp. at 850; *see Rand,* 537 F.Supp. at 597; *Sharp Corp.,* 656 F.Supp. at 180.

*The above approach is consistent with this court's approach in Wynn [Oil Co.] I [v. American Way Service Corp.,* 736 F.Supp. 746 (E.D.Mich.1990)] *wherein the court, upon determining that the defendant was guilty of infringement,*

*remanded to the district court with the directions to grant injunctive relief.*

943 F.2d. at 608 (other citations omitted).

Here, the Court did not initially award injunctive relief in contemplation of a motion to alter or amend its earlier findings and conclusions of law for potential error. The Court was of the view that the declaration of rights was sufficient in the interim. PRS did not file a Rule 59 motion or a motion to reconsider. The Court is now firmly convinced that injunctive relief to bar the production and sale of PRS's Singlecut is appropriate and necessary.

■■■ As to any stay pending an appeal, the standards to consider are those on awarding injunctive relief. *Hilton v. Braunskill,* 481 U.S. 770, 776, 107 S.Ct. 2113, 95 L.Ed.2d 724 (1987). For the reasons set forth in the Court's Memorandum, the Court does not believe that PRS will prevail on appeal. Gibson will suffer irreparable injury to its goodwill in its Les Paul, if PRS is not enjoined. Gibson's dealers would be injured by PRS's unlawful sales of its Singlecut. The Court deems it in the interest of justice to enforce registered trademarks. Given these findings, PRS's request for a stay of injunctive relief will be denied.

An appropriate Order is filed herewith.

### ORDER

In accordance with the Memorandum filed herewith, the Plaintiff's motion in limine (Docket Entry No. 146) is **GRANTED** to exclude the narrative testimony of Gary Wingo, the Defendant's expert witness, regarding any confusion in the marketplace between the Plaintiff's Les Paul Guitar and the Defendant's Singlecut and specifically his opinions and other statements related to Wingo's market research of purchasers of the Defendant's Singlecut guitar and any dealers that sell the Defen-

dant's Singlecut. This testimony is inadmissable and irrelevant to the remaining issue of disgorgement of profits. The Defendant's other proposed hearing exhibits (Docket Entry No. 155, Attachments B–8, 9, 10, 11, 12, 20, D, E, G, H, I, J, K and L) are likewise **EXCLUDED** as evidence for the same reasons.

It is further **ORDERED** that the Defendant's request for a jury trial is **DENIED** as contrary to the relevant statute and precedents.

In accordance with the Court's earlier Memorandum (Docket Entry No. 144), the Court awards injunctive relief to the Plaintiff, Gibson Guitar Corporation. This is hereby **ORDERED** that the Defendant Paul Reed Smith, its partners, employees, agents and all persons in active consent with them are **ENJOINED** from manufacturing, selling, or distributing, or in any manner, enabling or aiding others to manufacture, or to sell, or to distribute the PRS Singlecut guitar and all versions thereof, including but not limited to their exterior shapes and features, the designs of which have been determined to violate Plaintiff's rights to protection under the Lanham Act for its incontestable trademark registration, No. 1,782,606 for Les Paul guitar.

All other issues are **RESERVED** pending the hearing on disgorgement of profits from the infringing sales.

It is so **ORDERED**.